UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS H. HOFFMAN, | ) | CASE NO. 1:17CV1208 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SARA LIOI |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | AMENDED |
| SECURITY ADMINISTRATION, | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| Defendant. | ) | |

Plaintiff Thomas H. Hoffman ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #2. In his brief on the merits, Plaintiff asserts that the administrative law judge ("ALJ") erred by failing to give controlling weight to the opinion of his treating physician, the ALJ lacked substantial evidence for his credibility finding, and the ALJ erred in finding that Plaintiff could perform light work. ECF Dkt. #13. For the following reasons, the undersigned recommends that the Court AFFIRM the decision of the ALJ and dismiss the instant case in its entirety with prejudice.

I.    **FACTUAL AND PROCEDURAL HISTORY**

Plaintiff filed applications for DIB and SSI on October 31, 2013. ECF Dkt. #12 ("Tr.") at 183-197.[2] He alleged disability beginning March 31, 2009 on his DIB application and disability beginning October 4, 2013 on his SSI application, due to issues with walking because of hip replacement surgery and the inability to walk, sit or stand for any length of time. *Id.* at 222. The

---

[1]On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than when the Transcript was compiled. This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

Social Security Administration ("SSA") denied his applications initially and upon reconsideration. *Id.* at 128-151. Plaintiff requested a hearing before an ALJ, and the hearing was held on February 10, 2016. *Id.* at 36, 154.

On March 10, 2016, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI. Tr. at 21-31. On June 9, 2017, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #2. Plaintiff filed a brief on the merits on September 19, 2017 and Defendant filed her merits brief on October 16, 2017. ECF Dkt. #s 13, 14.

## II.     RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.     Relevant Medical Evidence

On October 26, 2009, Plaintiff presented to Dr. Keppler for left hip pain. Tr. at 282. He told Dr. Keppler that he had a total hip replacement 1.5 years prior and was doing well until he started developing severe pain in his left hip, even when walking short distances. *Id.* Plaintiff reported that he only had pain when ambulating. *Id.* He explained that he fell down while on the job in 1999 and after conservative therapy failed, he underwent the total hip replacement. *Id.* Plaintiff indicated that he was laid off from work on June 5, 2009 due to his hip pain. *Id.*

Dr. Keppler observed that Plaintiff ambulated with discomfort and an antalgic gait, although he had good range of motion. Tr. at 282. He reviewed an x-ray of the hip which showed that the total hip replacement was in good alignment. *Id.* He diagnosed left hip pain and status post total hip replacement and ordered lab work and a bone scan. *Id.* He prescribed Vicodin for Plaintiff. *Id.*

On September 9, 2010, Plaintiff presented to Dr. Keppler with concerns about whether he hurt his hip after he fell down the stairs. Tr. at 285. Dr. Keppler reported that Plaintiff's x-rays looked good, but his upper extremities were bruised. *Id.* Dr. Keppler noted that Plaintiff smelled like alcohol and he encouraged Plaintiff to stop smoking and to reduce his alcohol intake. *Id.* Dr. Keppler noted that there was a ASR cup DePuy recall on his hip impant and he notified Plaintiff, but he indicated that Plaintiff's cup looked fine and he noted that Plaintiff should follow up and have serum heavy metal testing periodically. *Id.*

On January 6, 2011, Plaintiff presented to Dr. Keppler for examination of his left hip, which had an ASR. Tr. at 286. Dr. Keppler noted that Plaintiff's cup size was larger that the ones that

-2-

were recalled, but Plaintiff was complaining of pain on internal and external rotation.  *Id*.  Plaintiff asked for a sleeping pill, but Dr. Keppler told him to get that from his family doctor.  *Id.*  Dr. Keppler ordered blood tests and a MRI.  *Id.*  He also switched Plaintiff from Vicodin ES to Nucynta. *Id*.

Dr. Keppler's January 13, 2011 notes indicated that he spoke to Plaintiff on the phone and Plaintiff stated that he could not obtain the prescription for Nucynta, which the doctor could not understand.  Tr. at 287.  The doctor noted that Plaintiff requested something different and asked for Percocet.  *Id*.  Dr. Keppler noted that Plaintiff was given Percocet the week prior and Plaintiff indicated that it was not working.  *Id.*  Plaintiff requested Vicodin ES again and it was ordered by Dr. Keppler.  *Id.*

On August 26, 2011, Dr. Keppler refilled Plaintiff's Vicodin ES.  Tr. at 288-289.

On November 14, 2011, Dr. Keppler examined Plaintiff for his hip pain and no significant change was found on his x-ray, which looked good.  Tr. at 290.  Dr. Keppler recommended a new MRI of the hip, some acute phase reactants, and special testing for the ASR recall. *Id.*

On March 22, 2012, Plaintiff presented to the emergency room for two months of intermittent vertigo after an assault to the head.  Tr. at 384.  Upon examination, he was assessed with otitis and benign positional vertigo.  *Id.* at 385.

On June 25, 2012, Plaintiff presented to Dr. Keppler for left hip and groin pain, and he felt a catching of the hip with particular movements.  Tr. at 291.  It was noted that Plaintiff still did not have health insurance, so Dr. Keppler continued to prescribe Vicodin ES over the last several years and would continue to monitor him.  *Id.*  Dr. Keppler noted that Plaintiff was an ASR recall, but he had not had recent blood work and had not talked to an attorney about the ongoing left hip pain he continued to experience.  *Id.*  Dr. Keppler took x-rays, which showed good alignment of the implant. *Id*.  He ordered blood work, but indicated that it would wait until Plaintiff contacted an attorney. *Id*.  Dr. Keppler indicated that the hip glided well, but Plaintiff continued to experience pain on internal and external rotation. *Id*.

On December 20, 2012, Plaintiff presented to Dr. Keppler and reported that he had a new job.  Tr. at 292.  Plaintiff indicated that he could not take time off to have his hip revised as a result.

-3-

*Id.* Dr. Keppler noted that Plaintiff was managing with conservative care and medications, but he recommended that Plaintiff get his hip revised. *Id.*

On May 30, 2013, a physician assistant (" PA")  for Dr. Keppler noted that Plaintiff was an ASR recall who did not follow up even though he received a letter about it. Tr. at 293.  The PA indicated that Plaintiff never followed through with a recommended MRI of the hip. *Id.*  X-rays were taken, which showed that the hip looked good. *Id.*  Blood tests were ordered to get chromium and cobalt levels, as well as to check for infection. *Id.*  He ordered a MRI as well. *Id.*

On July 12, 2013, Dr. Keppler ordered a MRI of the left hip which showed left hip arthroplasty changes without hardware complication, regions of advanced cartilage loss in the superior aspect of the right acetabular roof and in the central aspect of the right humeral head, and advanced degenerative changes of the symphysis pubis.  Tr. at 302.

Notes from Dr. Keppler's PA indicated that on August 12, 2013, Plaintiff called in to explain that he was having increased hip pain and he had slid down a hill and landed on his hip.  Tr. at 294. He related that after the slide, he did not think that he really injured himself, until he woke up the next morning in extreme pain.  *Id.*  The PA offered Plaintiff an appointment for that day, but Plaintiff reported that he was unable to get a ride there. *Id.*  He was told to go to urgent care or the emergency room to have someone look at his hip. *Id.*

On August 19, 2013, Dr. Keppler wrote a letter to Plaintiff describing Plaintiff's symptom as persistent pain in the left hip.  Tr. at 295. He indicated that Plaintiff's total hip replacement contained the ASR acetabular component which was the subject of a recall by the manufacturer. *Id.* He informed Plaintiff that the MRI scan did not show a significant soft tissue destruction and x-rays showed excellent bone stock of the acetabulum and a well-fixed S-rom type of total hip stem. *Id.* Nevertheless, Dr. Keppler believed that Plaintiff required revision hip surgery because of his persistent symptoms, his age, and his high activity level. *Id.*  He noted that the revision hip surgery would require exposure of the acetabular component, removal of the femoral head, and removal of the ACR acetabulum. *Id.*  He explained that a new femoral head could be placed without removing the stem because his hip stem was already in a modular device. *Id.*  He advised Plaintiff that Plaintiff would have to use crutches and could not return to vigorous activity for several months

-4-

after surgery.  *Id.*  On August 19, 2013, Dr. Keppler signed a certificate indicating that Plaintiff could return to regular work duties on August 20, 2013.  Tr. at 296.

On December 17, 2013, Plaintiff underwent a left hip revision and tissues were excised.  Tr. at 307.  X-rays on December 18, 2013 showed satisfactory alignment of the left hip prosthesis and the tissues excised showed no organisms.  *Id*. at 305-306.  Dr. Keppler referred Plaintiff to physical therapy and Plaintiff spent two months in Parkside Nursing Home performing daily physiotherapy. *Id.* at 340-354.  He was released from therapy on January 18, 2014 as he met his doctor's goal and he was weight-bearing.  *Id*. at 354.

A radiology report dated January 20, 2014 of Plaintiff's pelvis showed moderate osteoarthritis, while a hip x-ray showed the prosthetic left formal head in proper alignment without any loosening.  Tr. at 338.  A left ankle x-ray showed osteoarthritis.  *Id*. at 339.

January 27, 2014 progress notes from Dr. Keppler showed that Plaintiff was following up status-post left hip revision and was doing well overall with his left hip.  Tr. at 383.  X-rays showed that the implant was in good position and Plaintiff was advised to be weight-bearing as tolerated, and to ambulate more normally.  *Id.*

March 10, 2014 progress notes from Dr. Keppler showed that Plaintiff was doing "fairly well" after his revision surgery, but he continued with left hip and groin pain.  Tr. at 382.

On March 27, 2014, Dr. Kepper completed a physical capacities evaluation in which he diagnosed Plaintiff with post left total hip replacement with replacement revision, left knee surgery, right hip arthritis, and prior left hip arthroscopy.  Tr. at 356.  He opined that Plaintiff's prognosis was "fair to poor" and identified Plaintiff's symptoms as pain difficulty with gait and loss of motion. *Id.* He noted that Plaintiff's symptoms were often severe enough to interfere with his attention and concentration to perform simple work-related tasks and his medications caused dizziness and sleepiness which impacted his concentration as well.  *Id*.  Dr. Keppler further opined that Plaintiff could sit for up to 3 hours of an 8-hour workday, and he could stand and walk up to 2 hours each of an 8-hour workday.  *Id.* He indicated that alternating positions would be required every 30 minutes for Plaintiff.  *Id.* Dr. Keppler further opined that Plaintiff could occasionally lift and carry up to 10 pounds, and never lift and carry more than that.  *Id*. at 357.  He also opined that Plaintiff could

occasionally bend and frequently reach above shoulder level, he could never squat, crawl or climb, he was mildly restricted around unprotected heights and moving machinery, and he was moderately restricted around activities involving exposure to marked changes in temperature and humidity, and in driving automotive equipment. *Id*. at 358. He further opined that Plaintiff would need unscheduled breaks in order to relieve his hip pain and to rest every 30 minutes. *Id.*

On April 3, 2014, Dr. Assaf, M.D., an agency examining doctor, reviewed Plaintiff's medical history documenting his 1999 left leg injury where he had left knee surgery and eventually an abnormality in his left hip when his left leg continued to hurt following the knee surgery. Tr. at 361. He noted Plaintiff's left hip arthroscopy in 2000, and then a left hip replacement in 2004. *Id*. Plaintiff reported persisted left hip pain after the replacement and another hip replacement surgery in 2013 followed by physiotherapy in a nursing home for two months. *Id.* Plaintiff told Dr. Assaf that he could not stand and walk for more than 5 minutes, even with the cane that his doctor prescribed, and his pain fluctuated from an 8 out of 10 to a 10 out of 10. *Id.* Plaintiff reported trouble sleeping due to pain and he was taking pain medication, which took the edge off of the pain but did not completely relieve it. *Id*. His only medication was Hydrocodone. *Id*. at 361-362. Plaintiff related that he cooked and cleaned his house 3 times per week, did the laundry once per week, showered 4 times per week, socialized with friends, watched television, and made crafts, but he did not grocery shop because of his pain. *Id*. at 362.

Upon examination, Dr. Assaf noted that Plaintiff could not walk without a cane and still walked with a limp. Tr. at 363. He could not heel or toe walk due to left hip pain, his squatting was limited to 20 degrees, he had an abnormal stance, and he avoided putting weight on his left foot. *Id.* Dr. Assaf opined that Plaintiff needed the cane, even for walking short distances. *Id.* His musculoskeletal examination showed left hip pain upon straight leg raising at 40 degrees, with stable joints. *Id*. at 364. Dr. Assad noted limitations in Plaintiff's left hip flexion, extension, abduction, adduction and internal and external rotation from 20 to 50 degrees. *Id.* at 369. He also noted somewhat limited range of motion in the left knee with extension and flexion. *Id.*

On the basis of this examination, Dr. Assad diagnosed Plaintiff with left hip pain, status post two previous total hip replacement surgeries, and status post splenectomy because of a car accident.

Tr. at 364.  He opined that Plaintiff was markedly limited in activities requiring standing, walking, squatting and weight-bearing, and he believed that Plaintiff's prognosis was guarded.  *Id.*

On May 19, 2014, Dr. Keppler evaluated Plaintiff for his complaints of left groin pain and found that his symptoms were suspicious for a hernia, although he did not feel one protruding from the inguinal canal.  Tr. at 372, 381.  He indicated that x-rays showed that Plaintiff's hip implant was in good position.  *Id.*  Blood tests were ordered, and Plaintiff was referred for evaluation for a left inguinal hernia.  *Id.*

On May 27, 2014, Plaintiff presented to the emergency room after sustaining a head injury while he was drinking at a bar and got into an argument over the Steelers and Browns.  Tr. at 419.  He was tackled into a wall and hit his head on a coat hook.  *Id.*  He was diagnosed with a laceration to his scalp, a chest contusion, and a closed head injury.  *Id.* at 420.  He left the emergency room without repair of the laceration and in an unknown condition.  *Id.*

September 22, 2014 progress notes from Dr. Keppler show that Plaintiff followed up for his hip pain and was "not having much in the way of complaints."  Tr. at 380.  Dr. Keppler was pleased with the x-rays, which showed that the implant was in good position.  *Id.*

On February 5, 2015, Plaintiff presented to Dr. Keppler for reevaluation of his hips.  Tr. at 379.  He continued to complain of left-sided groin pain that was worse with ambulation and he was using a cane on occasion.  *Id.*  Plaintiff had difficulty with internal and external rotation of his right hip and his severe right hip osteoarthritis was discussed and possible total right hip replacement. *Id.*  Dr. Keppler indicated that it was time to refer Plaintiff to pain management for his hip complaints and narcotic pain medication.  *Id.*

On March 24, 2015, Plaintiff presented to Dr. Tabbaa at the pain management clinic for his hip pain.  Tr. at 438.  It was noted that he tried physical therapy, heat, ice packs, injections and medications for the pain.  *Id.*  He requested Norco multiple times during the evaluation as he felt that this was the only treatment that was helping.  *Id.*  He was not interested in injections.  *Id.*

Physical examination showed mildly painful lumbar examination, tenderness to palpation, abnormal gait, delayed hip pain of 10 out of 10 for all active and passive movements, but normal motor coordination and sensory examination.  Tr. at 440.  Dr. Tabbaa noted that no opioid therapies

were given by his clinic, but he prescribed Voltare and Gabapentin. *Id.* at 441.  He noted that Plaintiff was not interested in any procedures or interventions from the pain clinic. *Id.*  Dr. Tabbaa diagnosed chronic hip pain, hip osteoarthrosis and history of total hip arthroplasty, and he recommended pool therapy, home physical therapy, smoking cessation, and weight control. *Id.*

On April 23, 2015, Plaintiff presented to Dr. Keppler's office to schedule a right hip injection. Tr. at 378.  It was noted that Plaintiff had osteoarthritis in his right hip and was possibly going to undergo a right total hip replacement. *Id.*

On April 30, 2015, Dr. Keppler was sent a Listing Questionnaire by Plaintiff's social security attorney asking him to opine whether Plaintiff's hip condition satisfied the criteria of Listings 1.02 and 1.03 relating to major dysfunction of a weight-bearing joint. Tr. at 373.  In a letter dated April 30, 2015, Dr. Keppler reviewed Plaintiff's medical history, specifically his left hip replacement, and Dr. Keppler indicated that Plaintiff was going to undergo a right hip replacement as well. *Id*. at 374. Dr. Keppler opined that Plaintiff was not capable of remunerative employment due to his ongoing arthritic conditions, the fact that he is going to have to have a right total hip replacement, and the manufacturer's defect in the left hip replacement material. *Id.*  Dr. Keppler opined that with the surgeries that Plaintiff has undergone and will continue to undergo, as well as the monitoring of the recalled hip replacement, his left knee arthritis, and his bilateral hip pain, Plaintiff was not capable of even sedentary work. *Id*.

On May 18, 2015, Dr. Keppler completed a physical capacities evaluation in which he opined that Plaintiff could: stand and walk for up to 1 hour each per 8-hour workday; sit for up to 3 hours per workday, 1 hour at a time; lift up to 20 pounds occasionally; not use foot controls for repetitive movements; not bend, squat, crawl or climb at all; use a cane; and he could not sustain any full-time work activity at any exertional level. Tr. at 375-376.  Dr. Keppler opined that Plaintiff would miss 2 or more days per month due to his pain and other symptoms. *Id*. at 376.

**B.**     **Relevant Testimonial Evidence**

At the ALJ hearing, Plaintiff's counsel noted that Dr. Keppler sent Plaintiff to Dr. Goldner, a pain management specialist, and they were still waiting for treatment records from him. Tr. at 40.

Counsel requested that the record remain open for 3 weeks following the hearing in order to secure those records and present them. *Id.*  The ALJ agreed. *Id.*

Plaintiff reported that he took the proper classes in order to obtain his GED, but did not take the GED test. Tr. at 42.  He testified that the last time he worked was 3 months before his last hip surgery. *Id.*  He had prior employment as a die cutter for over 20 years, and his last job there involved walking a lot to pick up stacks of paper up to 110 pounds and carrying them. *Id.* at 44-45. He was laid off after he was unable to do the job. *Id.*

Plaintiff testified that he lives with his girlfriend, who helps him do housework, including washing dishes, because he cannot stand for very long. Tr. at 48.  He can dress himself, but has trouble bending over to put on his socks. *Id.*  He can drive, but he does not do so because he has problems getting in and out of most cars, so his girlfriend drives him. *Id.*  He uses a cane to walk long periods of time and  uses it in the house on his super bad days. *Id.* at 51.  He related that Dr. Keppler ordered him a cane upon his release from the nursing home after his hip surgery. *Id.* at 52-53.  He draws when he is not watching television. *Id.*  He spends most of his time reclined on the couch watching television. *Id.* at 48.

The ALJ then questioned the vocational expert ("VE"). Tr. at 64.  She asked the VE to consider a hypothetical person with the same age, education and past relevant work experience as Plaintiff with: the capacity for light work and the ability to stand 2 hours per 8-hour workday and sit up to 6 hours per workday; occasionally climb stairs and ramps; never climb ladders, ropes or scaffolding; balance frequently; occasionally stoop, kneel, crouch and crawl; have no concentrated exposure to vibration; and avoid all hazards defined as industrial machinery, unprotected heights, or similar things. *Id.* at 67-68.  The VE testified that such a hypothetical individual could not perform Plaintiff's past relevant work, but he could perform jobs existing in significant numbers in the national economy, such as the light jobs of an office helper or an information clerk, or the sedentary job of food and beverage order clerk. *Id.* at 68-69.  The ALJ added a requirement of using a cane, and the VE testified that this would not change the jobs that he provided for the original hypothetical individual. *Id.* at 69.

-9-

Plaintiff's counsel modified the ALJ's hypothetical individual, adding a sit/stand option at the frequency of every 15-20 minutes.  Tr. at 70.  The VE indicated that this would only nominally compromise the number of jobs about which he previously testified.  *Id.*  Counsel also added an absence from the job by the hypothetical individual of at least 2 days per month on an ongoing, unpredictable and unscheduled basis due to pain and other symptoms.  *Id.* The VE testified that no jobs would be available for such a hypothetical individual.  *Id.*  Counsel then added 2 additional breaks per day for the hypothetical individual to rest for at least one-half hour per break and the VE testified that such a limitation was not compatible with competitive employment.  *Id.* at 71. Plaintiff's counsel then added that the hypothetical individual would also be off task at least 20% of a normal workday and workweek due to difficulties concentrating.  *Id.*  The VE testified that this would not be compatible with competitive employment.  *Id.*

### III.    SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

In her March 10, 2016 decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 31, 2009, the alleged onset date, and she found that since that date, Plaintiff had the severe impairment of osteoarthritis of the right hip.  Tr. at 23.  The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Subpart P, Appendix 1.  *Id.* at 24-25.  After considering the record, the ALJ found that Plaintiff had the RFC to perform light work with the following limitations: stand and walking 2 hours per 8-hour workday; sitting up to 6 hours per 8-hour workday; occasional climbing of stairs and ramps, but no climbing of ladders, ropes or scaffolds; frequent balancing and occasional stooping, kneeling, crawling and crouching; no concentrated exposure to vibration and the avoidance of all exposure to hazards, defined as industrial machinery, unprotected heights, etc.  *Id.* at 25.

Based upon Plaintiff's age, education, work experience, the RFC and the VE's testimony, the ALJ determined that Plaintiff could not perform his past relevant work, but he could perform jobs existing in significant numbers in the national economy, such as light office helper, information clerk, and food and beverage order clerk.  Tr. at 30.  In conclusion, the ALJ found that Plaintiff had

not been under a disability, as defined in the Social Security Act, and he was not entitled to DIB or SSI from March 31, 2009, through the date of her decision. *Id.* at 31.

## IV.      STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits.  These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see   20 C.F.R.   § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.      STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

-11-

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (internal citations omitted).

## VI.  LAW AND ANALYSIS

### A.  Treating Physician

Plaintiff first asserts that the ALJ committed reversible error by failing to attribute controlling weight to the opinions of his treating physician, Dr. Keppler.  ECF Dkt. #13 at 13-15.

An ALJ must give controlling weight to the opinion of a treating source[3] if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  If an ALJ decides to discount or reject a treating physician's opinion, he or she must provide "good reasons" for doing so.  Social Security Rule ("SSR") 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*  This allows a claimant to understand how his case is determined, especially when he knows that

---

[3]  The Court notes that the SSA has changed the treating physician rule effective March 27, 2017.  *See* 20 C.F.R. § 416.920.  The SSA will no longer give any specific evidentiary weight to medical opinions, including affording controlling weight to medical opinions.  Rather, the SSA will consider the persuasiveness of medical opinions using the factors specified in their rules  and will consider the supportability and consistency factors as the most important factors.

-12-

his treating physician has deemed him disabled and he may therefore "be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he or she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. 2010). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ). However, an ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

If an ALJ declines to give controlling weight to the opinion of a treating source, he or she must determine the weight to give that opinion based upon a number of regulatory factors. 20 C.F.R. § 416.927(c)(2). Such factors include "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating

source." *Wilson*, 378 F.3d at 544, citing 20 C.F.R. § 416.927(c).  An ALJ is not required to discuss every factor in 20 C.F.R. § 416.927(c).

Dr. Keppler completed a physical capacities evaluation form on March 27, 2014, wrote a letter opining that Plaintiff was not capable of remunerative employment or sedentary employment on April 30, 2015, and he completed a second physical capacities evaluation form on May 18, 2015. Tr. at 356-359, 374, 375-377.  In her decision, the ALJ provided a paragraph generally explaining why she was not attributing controlling weight to any of Dr. Keppler's opinions.  *Id*. at 27.  She explained that Dr. Keppler's medical records did not address any significant issues as they set forth only a few sentences and found that Plaintiff's status was unchanged from prior visits.  *Id*.  She further found that Dr. Keppler's medical records contained no explanation of how Plaintiff's conditions limited him to the extent that Dr. Keppler opined.  *Id*.  The ALJ also noted that Plaintiff was seeing Dr. Keppler 2-3 times per year for mainly prescription refills.  *Id*.  And finally, the ALJ found that no outside medical records supported the severity of the limitations that Dr. Keppler opined for Plaintiff.  *Id*.

The ALJ then specifically addressed each of Dr. Keppler's opinions.  She considered the March 27, 2014 evaluation and attributed it only little weight, explaining that Dr. Keppler's statements on the form were internally contradictory.  *Id*. at 27.  She noted Dr. Keppler's findings that Plaintiff had no limitation in his upper extremities and could reach 100% of the time, but he also found in the same report that Plaintiff's ability to reach was no more than frequent.  *Id*. The ALJ also found that the severe restrictions that Dr. Keppler opined were not supported by his medical records, he made no connection between Plaintiff's conditions and the severe restrictions, and he completed the form only 4 months after Plaintiff's hip revision surgery, during a time period in which Plaintiff continued to recover.  *Id*.

The undersigned finds that an inconsistency or contradiction does not necessarily exist in Dr. Keppler's findings that Plaintiff had an ability to reach 100% of the time, he could lift and carry up to 10 pounds only occasionally, and he could reach above shoulder level frequently rather than continuously.  Tr. at 357-358.  The form asked if Plaintiff had limitations in "repetitive reaching, handling or fingering*." Id.* at 357.  Dr. Keppler checked "[n]o." *Id*.  Dr. Keppler wrote in "100%"

-14-

for the percentages in which Plaintiff could use his hands/fingers/arms for simple grasping, pushing and pulling, and fine manipulation. *Id*. The form asked if Plaintiff could "never, occasionally, frequently, or continuously" perform certain functions, including reaching above shoulder level. *Id*. at 358. Dr. Keppler checked "[f]requently" for reaching above shoulder level, which was defined as being able to perform such activities "35%-66% of an 8-hour workday, as opposed to "continuously," which was defined as "67%-100% of an 8-hour workday." *Id*. at 357. Dr. Keppler further found that Plaintiff could never lift and carry more than 10 pounds and could only occasionally lift up to 10 pounds. *Id*. Without further definition or guidance provided by the form, the undersigned can distinguish a difference between "reaching above shoulder level," "repetitive reaching, handling or fingering," and lifting and carrying up to 10 pounds occasionally. *Id*. The "100%" findings by Dr. Keppler in simple grasping, pushing and pulling and fine manipulation is consistent with his finding that Plaintiff had no limitations in repetitive reaching, handling or fingering. *Id*. Reaching above shoulder level is not the same as repetitive reaching or grasping, pushing and pulling and fine manipulation. And lifting and carrying up to 10 pounds may not necessarily have to do with Plaintiff's upper extremities, but rather his hips and steadying himself while lifting and carrying heavier objects. Thus, the undersigned recommends that the Court find that this is not a good reason for affording less than controlling weight to Dr. Keppler's March 27, 2014 report.

However, the reaching limitation is not the only finding that the ALJ relies upon in affording little weight to Dr. Keppler's March 2014 evaluation. She also explains that Dr. Keppler's own records do not support "anywhere near the level of restriction noted in this opinion." Tr. at 27. She concludes that the evaluation fails to provide a basis for Dr. Keppler's findings or the relationship between Plaintiff's conditions and Dr. Keppler's severe restrictions. *Id.* She also notes that this physical capacity evaluation was completed only 4 months after Plaintiff's left hip revision surgery and Plaintiff was therefore still recovering at the time that the evaluation was completed. *Id.*

The undersigned recommends that the Court find that the ALJ has provided good reasons for attributing less than controlling and only little weight to Dr. Keppler's March 27, 2014 evaluation and substantial evidence supports her determination. The ALJ points out that Dr.

-15-

Keppler's March 2014 evaluation was completed only 4 months after Plaintiff's revision surgery and he does not explain how Plaintiff's continued recovery would impact Dr. Keppler's severe limitations in this evaluation. Tr. at 27, 356-359. The undersigned notes that the ALJ herself relied upon an agency physician's disability determination made on April 7, 2014, only one week after Dr. Keppler's evaluation, which also does not explain how Plaintiff would be likely to recover. *Id*. at 27, 76-83, 356-359. Nevertheless, the ALJ is correct that Dr. Keppler's medical records do not support his severe restrictions for Plaintiff. *Id*. at 27. Dr. Keppler's May 19, 2014 treatment note indicated that Plaintiff reported left groin pain, but x-rays showed that the implant was in good position and he was evaluated for a hernia. *Id.* at 381. Dr. Keppler's March 10, 2014 progress note indicated that Plaintiff underwent the left total hip revision on November 26, 2013 and was "overall doing fairly well" following the surgery, although he complained of left hip and groin pain. *Id*. at 382. It was further noted that the implant looked to be in good alignment, and Plaintiff could begin ambulating and weight-bearing as tolerated. *Id*. Dr. Keppler's January 27, 2014 progress note indicated that Plaintiff was "overall doing well" with his left hip, Dr. Keppler was pleased with Plaintiff's progress, and x-rays showed that the implant was in good alignment. *Id*. at 383. Progress notes dated September 22, 2014 from Dr. Keppler reported that Plaintiff "is not having much in the way of complaints," x-rays showed that the implant was in good position, and Dr. Keppler was pleased. *Id*. at 380. It was further noted that Plaintiff would follow up on a routine basis because it "has to do with his insurance forms. That is why he came in. He will see us on an as-needed basis. But all-in-all, he is doing fairly well." *Id*.

The ALJ also attributed no weight to Dr. Keppler's April 30, 2015 letter, in which Dr. Keppler outlined Plaintiff's medical history dating back to 1999 and concluded that Plaintiff was not capable of even sedentary work and could perform no remunerative employment. Tr. at 374. Dr. Keppler had noted that he had actually taken Plaintiff off of work in 2000 for his severe arthritic pain and he indicated that Plaintiff was due for a right hip replacement. *Id.* The ALJ attributed no weight to this letter, finding that Dr. Keppler did not provide any functional assessment in the letter. *Id*. at 27. She explained that she placed no value on Dr. Keppler's explanation that he took Plaintiff off of work in the year 2000 for severe arthritis because his progress notes showed that he released

-16-

Plaintiff to go back to work in August 2013 and Plaintiff had a substantial work history for a number of years after 2000.  Tr. at 28.  She further noted that the letter simply listed Plaintiff's medical history and concluded that Plaintiff was disabled, which is a finding to be made by the ALJ.  *Id.*

The undersigned recommends that the Court find that the ALJ properly applied the treating physician rule and substantial evidence supports her determination as to the April 30, 2015 opinion letter.  While Dr. Keppler summarized Plaintiff's medical history, treatment notes as referenced above following Plaintiff's two left hip surgeries showed that he was doing fairly well and his implant was in good alignment.  Dr. Keppler had indicated in his letter that he had taken Plaintiff off of work in 2000, but as the ALJ pointed out, Dr. Keppler released Plaintiff to return to work in August of 2013 and Plaintiff had a substantial work history after 2000, which negated the value of Dr. Keppler's prior decision to take Plaintiff off of work.  *Id.* at 28, 296.  Moreover, as Dr. Keppler noted in 2012, Plaintiff was working a new job and could not take time off to schedule the left hip revision surgery.  *Id.* at 292.  Plaintiff was managing with conservative care.  *Id.*  Further, as the ALJ correctly pointed out, Dr. Keppler's conclusion that Plaintiff was disabled was not entitled to special significance because disability is an issue reserved to the Commissioner.   20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).  The ALJ also noted that while Dr. Keppler mentioned that Plaintiff was going to have a right hip replacement, it was not yet done at the time of the February 2016 ALJ hearing.  *Id.* at 28.  Further, x-rays of the right hip dated August 6, 2015 show no acute fracture or dislocation, but joint space narrowing superiority with minor spurring and subchondral cyst involving the superior acetabulum.  *Id.* at 468.  The impression was that Plaintiff had early degenerative arthritic changes in the right hip.  *Id.*

The ALJ also addressed Dr. Keppler's May 18, 2015 physical capacities evaluation, attributing it no weight as well.  Tr. at 28, citing Tr. at 375-377.  The ALJ found that this evaluation was inconsistent with Dr Keppler's treatment records and with his April 30, 2015 letter and his March 2014 evaluation. *Id.* at 28.  The ALJ noted that Dr. Keppler failed to explain why in April of 2015, Plaintiff could lift more weight but could stand and walk even less than in April 2014.  *Id.*  The May 18, 2015 evaluation form also contains a section which requests that the doctor list the patient's diagnoses and state the clinical findings, objective test results and treatments in support of

the assessment. *Id*. at 376. Dr. Keppler left this space blank. *Id*. In addition, February 5, 2015 progress notes indicate that Plaintiff presented to Dr. Keppler for reevaluation, and although he complained of left groin pain, he "otherwise has very little complaints." *Id.* at 379. The undersigned recommends that the Court find that the ALJ sufficiently articulated good reasons for rejecting Dr. Keppler's opinion and substantial evidence supports her decision to do so based upon the lack of support for such restrictions in Dr. Keppler's progress notes.

### B.    Agency Examining Physician

Plaintiff also challenges the ALJ's decision to assign little weight to the findings of Dr. Assaf, an agency examining physician. ECF Dkt. #13-15. Dr. Assaf diagnosed Plaintiff with left hip pain status post two prior total hip replacement surgeries, and status post splenectomy due to a car accident. Tr. at 364. He found on April 3, 2014 that Plaintiff's prognosis was guarded and Plaintiff had marked limitations in activities requiring standing, walking, squatting, and weight-bearing. *Id*.

In attributing little weight to this opinion, the ALJ explained that Dr. Assaf's findings were inconsistent with his relatively mild examination findings. Tr. at 28. The undersigned recommends that the Court find that substantial evidence supports this determination as Dr. Assaf's examination findings indicated good manual muscle testing of the hip flexors and hip extensors, and normal manual muscle testing for Plaintiff's shoulders, elbows, wrists, fingers, knees and feet. *Id*. at 366. He also found no muscle spasms or atrophy, normal ranges of motion in the neck and shoulders, nearly normal ranges of motion in the dorsolumbar spine, normal range of motion in the right hip, and somewhat reduced range of motion in the left hip. *Id.* at 367-369. He noted no redness, heat, swelling or effusion and stable joints, except for left hip pain and straight leg raising producing left hip pain at 40 degrees. *Id*. at 364. Dr. Assaf did find that Plaintiff walked with a limp on the left even when using a cane and he opined that Plaintiff needed the cane, even for walking short distances. *Id.* at 363.

In addition, the ALJ found that Dr. Assaf's findings were too broad to be used in a functional capacity evaluation. Tr. at 28. The undersigned agrees as Dr. Assaf did not qualify or quantify his opinion concerning his findings of "marked" limitations on Plaintiff's abilities to stand, walk squat

-18-

and bear weight.  *Id.* at 364.  Moreover, the ALJ included limitations on standing and walking to only 2 hours of an 8-hour workday for Plaintiff, and the light work exertional level that she determined for Plaintiff usually involves lifting "very little" and can involve sitting most of the time, thereby accommodating Dr. Assaf's findings.  20 C.F.R. §§ 404.1567(b), 416.967(b).

Since the ALJ properly considered Dr. Assaf's opinion, substantial evidence supports her reasons for attributing little weight to his opinion, and she nevertheless provided for most of his limitations in her RFC for Plaintiff, the undersigned recommends that the Court find no merit to Plaintiff's assertion that the ALJ committed reversible error as to Dr. Assaf's opinion.

### C.      Credibility

Plaintiff further asserts that substantial evidence does not support the ALJ's credibility determination.  ECF Dkt. #13 at 16-18.  He contends that the ALJ's "main point of contention" in assessing his credibility focused on the negative circumstances surrounding the emergency room visits and the lack of findings in the records which were unrelated to Plaintiff's hips or use of a cane. *Id.* at 16-18.  Plaintiff asserts that since these emergency room visits were not related to his hips or legs, they would not refer to his hips or use of a cane.  *Id.*  He also contends that the ALJ relied upon the negative circumstances underlying these visits in order to undermine his character and discount his credibility.  *Id.*

The social security regulations establish a two-step process for evaluating pain.  *See* 20 C.F.R. § 404.1529, SSR 96–7p[4].  In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117

---

[4] Effective March 28, 2016, SSR 16-3p superceded SSR 96-7p.  *See* SSR 16-3p.  SSR 16-3p eliminates the use of the term "credibility" in order to "clarify that subjective symptom evaluation is not an examination of an individual's character.  SSR 16-3p.  Thus, adjudicators must consider all evidence in a claimant's record in evaluating the intensity and persistence of symptoms in order to determine how the symptoms limit an individual's ability to perform work-related activities.  *Id.*  SSR 16-3p emphasizes that in evaluating a claimant's symptoms, the focus is not to determine whether he or she is a truthful person.  *Id.*  The ALJ's decision in this case predates the effective date of SSR 16-3p.

(6th Cir.1994); *Felisky v. Bowen*, 35 F.3d 1027, 1038–1039 (6th Cir.1994); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir.1986). Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. *See id.* Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *See id.*

When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96–7p. *See* SSR 96–7p, 61 Fed.Reg. 34483, 34484–34485 (1990). These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039–40. Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination. *See Casey*, 987 F.2d at 1234. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997).

In the instant case, the ALJ cited to the proper social security regulations and rulings in evaluating Plaintiff's credibility.  Tr. at 25.  She determined that while Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of his symptoms were not fully credible.  *Id*.  The ALJ did cite to the emergency room records from May 2014 where Plaintiff was brought in intoxicated after he was tackled into a coat rack at a bar and sustained a cut on his head. *Id*. at 26-27.  The ALJ noted that the emergency room records showed no use of a cane, no problems

with Plaintiff's ambulation, and no  issues with hip or leg pain or limitations.  *Id*. at 27.  The ALJ noted that the emergency room record also showed that Plaintiff was able to ambulate under his own power and he left against medical advice.  *Id*.  While Petitioner asserts that the ALJ inferred that he did not have a cane or difficulty ambulating because the medical record did not expressly state these findings, this medical record actually indicated that Plaintiff had no difficulty ambulating and had a steady gait. *I*d. at 418.   The record specifically stated that "Patient seen ambulating out of department, steady gait."  *Id*.  It also specifically stated that Plaintiff denied an inability to ambulate, and he had normal musculoskeletal and constitutional systems upon examination. *Id.* at 419.

The ALJ also cited to a February 7, 2016 emergency room record where Plaintiff reported being stabbed in the scapula the night before.  Tr. at 27.  The ALJ referenced the emergency room record which indicated that after a few hours, Plaintiff left the emergency room after telling the nurse's desk that he did not want to be seen anymore.  *Id*. The ALJ did note that this record did not refer to his use of a cane or that he had trouble ambulating.  *Id*.  However, as Respondent points out, this record specifically stated that Plaintiff "walked" back to the nurse's desk and informed someone that he did not want to be seen and he left.  *Id.* at 477.

Plaintiff also points out in his brief that Dr. Keppler indicated in 2004 that he wanted Plaintiff to get a cane due to his hip pain.  ECF Dkt. #13 at 18, citing Tr. at 264.  While Dr. Keppler did recommend that Plaintiff use the cane at that point, there are indications thereafter that Plaintiff was weight-bearing and ambulating without a cane after his first hip replacement.  Dr. Keppler noted that Plaintiff was using crutches and was partial weight-bearing on April 25, 2007. *Id*. at 275.  On May 24, 2007, Plaintiff was using the cane "right now," but was going to start physical therapy "and progress off the cane."  *Id.* at 276.  June 22, 2007 progress notes indicate that Plaintiff was "able to bear weight without any assistive device."  *Id*. at 277.   Dr. Keppler's January 10, 2008 progress notes indicate that Plaintiff had a slight limp when he walked, but he "doesn't need any support to walk."  *Id*. at 279.  When his left hip pain restarted in October of 2009, no cane was noted and Plaintiff complained of pain with just short distance ambulation.  *Id.* at 282.  In September of 2010, Plaintiff had fallen down the stairs and was concerned whether he hurt his hip.  *Id*. at 285.  His x-rays looked good and no cane was noted.  *Id.* Dr. Keppler's December 20, 2012 progress note

indicated that Plaintiff could not take time off for the hip revision surgery as he had started a new job.  *Id*. at 292.  No cane was noted.  *Id.*  On May 30, 2013, Plaintiff followed back up with Dr. Keppler, who noted that he was an ASR recall who had not followed up, but x-rays showed that the hip looked good.  *Id.*  August 12, 2013 progress notes from Dr. Keppler indicate that Plaintiff called in because he was trying to take a picture of a duck in a creek behind his apartment complex when he slid down a hill and landed on his left hip.  *Id*. at 294.

Thus, although Dr. Keppler did recommend the cane in 2004, there is evidence that progress was made which returned Plaintiff to ambulation without a cane at one time.  There is no further indication of Plaintiff using a cane again until March 10, 2014, when Dr. Keppler noted that Plaintiff could begin ambulating weight-bearing as tolerated, but he continued to use a cane for ambulation.  *Id.* at 382.  Dr. Keppler had noted in January of 2014 that Plaintiff should be able to progress his weight-bearing as tolerated and he should begin ambulating more normally.  *Id.* at 383.  Nevertheless, in his May 18, 2015 evaluation, Dr. Keppler checked the "YES" box to the question of whether Plaintiff required the use of a cane or other ambulatory aid, and Dr. Assaf indicated in his consultative examination that Plaintiff required the use of a cane as well, even for walking short distances.  *Id.* at 363, 376.  Thus, while the ALJ is correct that no medical explanation exists in the record for Plaintiff's use of a cane, there is medical verification from Dr. Keppler and Dr. Assaf that Plaintiff required the use of a cane sometime in 2004 and again in 2014.

In any event, the undersigned recommends that the Court find that the ALJ erroneously relied upon the negative circumstances surrounding Plaintiff's emergency room visits and a lack of emergency room notations concerning Plaintiff's hip pain and use of a cane in discounting his credibility.  The ALJ also erroneously discounted Plaintiff's credibility with regard to using a cane and whether any doctor had recommended its use.

While the ALJ did commit these errors, the undersigned recommends that the Court find that they are harmless.  The ALJ applied the correct credibility standard and substantial evidence supports her decision to discount Plaintiff's credibility because she relied upon evidence other than the emergency room records and lack of notations or explanations relating to the use of a cane and Plaintiff's ability to ambulate.  The ALJ reviewed Dr. Keppler's progress notes showing that he was

pleased with Plaintiff's progress and x-rays, the x-rays showing good alignment of the left hip implant, and she reviewed Dr. Keppler's physical capacity evaluations and letter which contradicted his medical records.  Tr. at 25-27.  The ALJ also reviewed Dr. Assaf's consultative examination findings and opinion, and properly found that his marked limitations for Plaintiff were not specific enough to use in the RFC and were not consistent with his relatively mild examination findings.  *Id*. at 28.  She also discussed and relied upon the findings and opinions of the state agency reviewing physicians, who found that Plaintiff could perform limited light work with restrictions to standing/walking up to 2 hours per 8-hour workday, sitting up to 6 hours per 8-hour workday, never climbing ladders, ropes or scaffolds, occasionally climbing ramps and stairs, occasionally stooping, kneeling, crouching and crawling, avoiding hazards and concentration exposure to vibrations.  *Id*. at 28-29, citing Tr. at 81-83, 105-108.

In addition, the ALJ specifically acknowledged Plaintiff's two hip surgeries as establishing severe conditions, and she acknowledged Dr. Keppler's finding that Plaintiff will require a right total hip replacement.  Tr. at 29.  However, she noted that no explanation existed in the record as to how Plaintiff's functioning had changed since 2009, his disability onset year, as Dr. Keppler released Plaintiff to return to regular work in August of 2013, (*Id*. at 296), his May 19, 2014 progress note indicated that x-rays showed that the implant was in good position (*Id*. at 381), and his March 10, 2014 progress note indicated that Plaintiff underwent the left total hip revision on November 26, 2013 and was "overall doing fairly well" following the surgery, although he complained of left hip and groin pain.  *Id*. at 382.  Further, Dr. Keppler's January 27, 2014 progress note indicated that Plaintiff was "overall doing well" with his left hip, Dr. Keppler was pleased with Plaintiff's progress, and x-rays showed that the implant was in good alignment.  *Id*. at 383.  Progress notes dated September 22, 2014 from Dr. Keppler reported that Plaintiff "is not having much in the way of complaints," x-rays showed that the implant was in good position, and Dr. Keppler was pleased.  *Id*. at 380.  It was further noted that Plaintiff would follow up on a routine basis because it "has to do with his insurance forms.  That is why he came in. He will see us on an as-needed basis.  But all-in-all, he is doing fairly well." *Id*.

Accordingly, even if the ALJ erred in considering the negative circumstances surrounding Plaintiff's emergency room visits and the lack of notations in the emergency room records regarding hip pain and the use of a cane, and she erred in finding that Plaintiff used a cane of his own volition, these errors are not reversible because she considered much more than them in determining Plaintiff's credibility.

### D.      RFC

Finally, Plaintiff asserts error with the ALJ's determination that he could perform a limited range of light work.  ECF Dkt. #13 at 15-16.  He contends that the ALJ's finding of light work is directly at odds with the opinions of Drs. Keppler and Assaf and the ALJ erred in not asking the VE to identify jobs that an individual could perform with the limitations provided by Drs. Keppler and Assaf.  *Id*. at 16.

A claimant's RFC is an assessment of the most that a claimant "can still do despite [his] limitations." 20 C.F.R. §§ 416.945(a)(1). An ALJ must consider all of a claimant's impairments and symptoms and the extent to which they are consistent with the objective medical evidence. 20 C.F.R. § 416.945(a)(2)(3).  The claimant bears the responsibility of providing the evidence used to make a RFC finding.  20 C.F.R. § 416.945(a)(3).  However, the RFC determination is one reserved for the ALJ. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5.  Social Security Ruling ("SSR") 96-8p provides guidance on assessing RFC in social security cases.  SSR 96-8p.  The Ruling states that the RFC assessment must identify the claimant's functional limitations and restrictions and assess his or her work-related abilities on a function-by-function basis.  *Id*.  Further, it states that the RFC assessment must be based on *all* of the relevant evidence in the record, including medical history, medical signs and lab findings, the effects of treatment, daily living activity reports, lay evidence, recorded observations, effects of symptoms, evidence from work attempts, the need for a structured living environment and work evaluations.  *Id*.

In determining Plaintiff's RFC in the instant case, the ALJ considered the proper regulations and Social Security Rulings and the proper evidence, including Plaintiff's symptoms and the

-24-

objective medical evidence. Tr at 25-29. She was not required to ask the VE to assume a hypothetical person with the limitations identified by Drs. Keppler and Assaf because an ALJ determines RFC, not treating or examining physicians. 20 C.F.R. §§ 404.1567(d)(3), 416.967(d)(2). Accordingly, while the limitations provided by medical sources are considered, they are not given any special significance. *Id.* In this case, the ALJ reviewed the opinions of Drs. Keppler and Assaf and articulated her reasons for the weight that she assigned to them, which the undersigned recommended that the Court find to be supported by substantial evidence. Consequently, the ALJ incorporated into her hypothetical individual to the VE those limitations that she found were credible and supported.

As to not incorporating Plaintiff's use of a cane into her RFC, the ALJ may have erred in discounting Plaintiff's credibility by implying that Plaintiff himself decided that he needed to use a cane. Tr. at 29. While the ALJ correctly found that the medical record was void of an order or prescription by a medical source for the cane, Dr. Keppler found that a cane was necessary for Plaintiff in 2014 and Dr. Assaf found that Plaintiff needed to use the cane, even for walking short distances. *Id.*, Tr. at 363, 376. However, the ALJ was correct in finding that no doctor discussed when Plaintiff must use the cane or described how much that he needs to use it. *Id.* at 29. SSR 96-9p provides in relevant part:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case.

In this case, even assuming that Drs. Keppler and Assaf found that the cane was necessary in 2014, neither described the circumstances for which it was needed so that the ALJ could incorporate into her RFC, and she nevertheless substantially limited Plaintiff's standing and walking in her RFC. Consequently, substantial evidence supports the ALJ's RFC for Plaintiff.

**VII.**    **CONCLUSION AND RECOMMENDATION**

For the following reasons, the undersigned recommends that the Court AFFIRM the decision of the ALJ and dismiss the instant case in its entirety with prejudice.

Date: July 5, 2018                               ____/s/George J. Limbert_____
                                                              GEORGE J. LIMBERT
                                                              UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).